UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 2009-220(WOB-JGW)

KATHLEEN LAWS                                          PLAINTIFF

VS.

### OPINION AND ORDER
### GRANTING SUMMARY JUDGMENT
### IN FAVOR OF DEFENDANT

HEALTHSOUTH NORTHERN KENTUCKY
REHABILITATION HOSPITAL LIMITED
PARTNERSHIP d/b/a HealthSouth
Kentucky Rehabilitation Hospital               DEFENDANT


This matter is before the court on Defendant's motion for summary judgment. (Doc. #22).[1] Having previously heard oral argument, and having taken the matter under submission (Doc. #42), the court now issues the following Opinion and Order.

## *Introduction*

Plaintiff Kathleen Laws worked as a licensed practical nurse at HealthSouth Kentucky Rehabilitation Hospital (hereinafter "HealthSouth" or "Defendant") for almost a decade before she was fired in October 2008. She characterizes

---

[1] Unless otherwise noted, all citations are to CM/ECF pagination, and not the internal pagination of the exhibit.

Defendant's disciplinary actions and decision to dismiss her as "unwarranted" and "retaliatory."  After filing a charge with the Equal Employment Opportunity Commission and receiving a right to sue letter, she filed the instant action.  *See* Doc. #1 at 2 (hereinafter "Complaint"); Doc. #6 at 2.

Plaintiff claims HealthSouth's actions amount to discriminatory conduct under the Americans with Disabilities Act (hereinafter "ADA"), 42 U.S.C. § 12101 et seq., the Age Discrimination in Employment Act (hereinafter "ADEA"), 29 U.S.C. § 621 et seq., and the Kentucky Civil Rights Act (hereinafter "KCRA"), the state counterpart to those two federal statutes, KY. REV. STAT. § 344.040.  *See* Complaint at 4-7 (Counts I, II, V, VI). She further claims the actions amount to retaliation and interference in violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 et seq., and § 510 of the Employment Retirement Income Security Act of 1974 (hereinafter "ERISA"), 29 U.S.C. § 1140.  *See* Complaint at 5-6 (Counts III, IV).

Defendant moves for summary judgment on each claim. For the reasons below, the Court grants the motion and dismisses this action with prejudice.

## *Factual Background*

Among other facilities, HealthSouth operates a rehabilitation hospital in Edgewood, Kentucky, that offers both

in-patient and some out-patient services. *See* Doc. #27-1 at 11 (hereinafter "Fey Depo."). Plaintiff began working there in 1999 and was responsible for direct patient care.

Lynn Edmondson was Plaintiff's direct supervisor. *See* Doc. #36 at 4-5 (hereinafter "Edmondson Depo."). Chief Nursing Officer (hereinafter "CNO") Debra Fey was Edmondson's direct supervisor as of May 2008. Prior to that, other individuals served as Edmondson's direct supervisor in the CNO capacity. *See id.* at 2, 4, 5, 9. CNO Fey had many responsibilities, but primarily oversaw "clinical staff," including "nurses and non-nursing professionals, such as nursing assistants or techs." Fey Depo. at 11-13.

CNO Fey and Human Resources Director (hereinafter "HRD") Diane Goldschmidt reported directly to HealthSouth's Chief Executive Officer ("CEO") Brenda Gosney. *See* Doc. #26-1 at 11 (hereinafter "Goldschmidt Depo."); Fey Depo. at 16. Part of HRD Goldschmidt's duties included being the "liaison to the corporate office" in Alabama. As such, she interacted with Regional Director of Human Resources for the Mid-Atlantic Region Joseph Koehler. *See* Goldschmidt Depo. *at 11-12; see also* Doc. #24-1 at 8 (hereinafter "Koehler Depo."); Doc. #22-6 at 1, ¶ 1. (hereinafter "Koehler Aff.").[2]  In her liaison capacity, HRD

---

[2] Plaintiff's counsel terminated the Koehler telephone deposition saying they would reschedule an in-person deposition. Koehler Depo. at 25. Only

Goldschmidt forwarded employee requests for FMLA leave to the corporate office for approval.  *See* Goldschmidt Depo. at 11-12. She also maintained employee files at HealthSouth and reviewed disciplinary interventions taken by supervisors for consistency with corporate policy and antidiscrimination laws.  *See id.* at 12-14, 17-18.

## A.   2003 & 2004 – Room For Improvement

Before her health problems began, Plaintiff's evaluations reflected two areas where she could improve her performance – attendance and responding appropriately when frustrated.  On April 29, 2003, for example, Plaintiff received verbal counseling regarding "call-ins 3/13, 3/28, 4/2, 4/14, 4/20," and failing to "report to work when schedule[d]."  Doc. #25-2 at 16, 17 (hereinafter "Dismissal Request Exhs.").  The supervisor responsible for this counseling was Lynn Bean.  *See Edmondson Depo.* at 3-4, 9.  Plaintiff did not indicate on the disciplinary form whether she "agreed" or "disagreed," but did sign it.  *See* Dismissal Request Exhs. at 16, 17.

In her 2004 annual performance appraisal, Plaintiff received a "3" in all areas, which meant she "consistently" met the "expectations of the position."  *See* Doc. #25-4 at 5. However, she also received a "2" for "attendance regularity and

the Koehler telephone deposition and Koehler affidavit are before the court, however.

punctuality in reporting to work and returning from breaks . . .
7 occurrences." *Id*. at 6.  The "2" signified that she did "not
meet all expectations" and "improvement . . . is needed." *Id*.
at 7.  The "areas for improvement" section noted she should only
take "the allowed 2 breaks and return on time as well as from
meals," *id*. at 6, and the "performance improvement action plan
section" listed the goal that Plaintiff "improve [her]
attendance," *id*. at 7.  Plaintiff wrote that she "always" came
back from meals on time," *id*. at 6, but also wrote "yes!" next
to the goal of improving attendance, *id.* at 7.

Another area noted for improvement was for Plaintiff to
"keep [her] cool when frustrated with physician," which is
underlined.  *Id*. at 6.  Plaintiff signed the form. *Id*. at 8.

## B.    2005 – Aneurysm Surgery

The year 2005 marked the onset of health issues for the
Laws family.  In April, Plaintiff's husband was diagnosed with
cancer and he underwent radiation treatment from the end of the
year through the beginning of 2006.  Starting in 2007, he began
receiving thrice-yearly shots for his condition, and evidently
continues to receive them.  *See* Doc. #31-1 at 1, ¶¶ 1-3
(hereinafter "Laws Aff.").

In June 2005, Plaintiff developed an aneurysm behind her
left eye when an artery ballooned to the "size of a walnut."
*See* Doc. #23-1 at 30-31 (hereinafter "Laws Depo.").  She was

hospitalized for two weeks and then underwent surgery in early July.  The procedure involved placement of a "stent."  She was later readmitted for complications with her eye.  All together, she took four months leave from June 2005 through September 2005.  She used FMLA leave for this purpose but because the aneurysm came on suddenly and resulted in hospitalization, she did not recall exactly how the paperwork was processed.  She believed her surgeons submitted it.  *See id.* at 22, 24-25, 35; Laws Aff. ¶¶ 4-6; Doc. #36-1 at 5 (hereinafter "FMLA & Evaluations Exhs.").

Plaintiff signed her annual performance review when she returned to work in late October 2005.  *See* FMLA & Evaluations Exhs at 10.[3]  It again assessed her with a "3" in all areas, meaning performance as expected, and also gave her a "4" in "job knowledge," meaning "outstanding performance that clearly exceeds expectations of the position."  *Id.* at 9.  A continued "area for improvement," however, was to "keep [her] cool when

---

[3] Plaintiff's October signature does not indicate that her performance review was delayed due to her recovery.  Plaintiff began work in August 1999.  Her performance reviews indicate that the supervisors began making their annual assessments in July, but that their meeting and discussion with Plaintiff did not take place until the Fall.  Thus, on all of her performance reviews, the supervisory signatures are dated in the Summer, while Plaintiff's is dated much later.  *See, e.g.,* Doc. #25-4 at 8 (2004 appraisal with supervisory dates in July and August, and employee signature in October); *id.* at 4 (2005 appraisal with supervisory dates in July and employee signature in October); Employee File Exhs. at 17 (2006 appraisal with supervisory dates in July and employee signature in October); *id.* at 26 (2007 appraisal with supervisory signatures in July and August, and employee signature in October).

frustrated with physician," *id.* at 8, with the action plan to "be calm and professional even when frustrated," *id.* at 9.

The resulting conditions due to the aneurysm and surgeries were headaches, reduced vision in the left eye, and lack of endurance.  Plaintiff had no cognitive effects, however, and her eyesight did not impact her ability to work or perform her normal daily activities.  *See* Laws Depo. at 30-33.  In addition, the headaches were not a permanent or chronic condition.  *See id.* at 25-26.  Plaintiff's main complaint was lack of endurance, which she attributed to the effects of anesthesia after her two procedures.  *See id.* at 31.

## C.  2006 – "Call-In" Problems & Second FMLA Leave Request

Before her second surgery in July 2006, on April 3, 2006, Plaintiff received "verbal counseling" for the "violation" of missing work on March 30, 2006.  *See* Dismissal Request Exhs. at 14, 15.  At that time, Supervisor Edmondson was responsible for scheduling nurses' work shifts and, thus, responsible for tracking Plaintiff's "tardies" and "absences" and reporting them to her supervisor, Jenna Wellbrock.  Ms. Wellbrock, acting as CNO, signed the April 3rd discipline form.  *See* Edmondson Depo. at 2, 4, 57.  The "description" section notes more than just the isolated March 30th violation, including "(1-10-06) (2-1-06) (3-1-06) (3/20 -3/21) (3/30)."  Dismissal Request Exhs. at 14. Plaintiff was advised that, to avoid a written warning for

attendance, she must not miss work through end of the year.  *See id.* at 15.  Plaintiff "disagreed" with this assessment, noting in writing that each of the listed occurrences were "accompanied by written excuse by a doctor re: my health," with the exception of March 30th, when she "unexpected[ly]" had to "euthanize my cat."  *Id.* at 14.  She refused to sign the counseling form.  *See id.* at 15.

On May 2, 2006, Plaintiff executed a "Request For Family And Medical Leave Of Absence" form and requested leave from "June 22" to "pending."  FMLA & Evaluations Exhs. at 1.  The record is unclear whether HRD Goldschmidt transmitted the request, and whether the request was approved for this unspecified and open-ended period.  Plaintiff did undergo a second aneurysm surgery on May 12, 2006 according to her doctor (in June 2006 according to Plaintiff) where, apparently, the stent was either replaced or checked.  *See* Laws Depo. at 31, 35; Laws Aff. ¶ 13.

The record does not indicate how long Plaintiff was out of work after the second surgery.  She evidently returned by mid-August because on August 13, 2006 she received a written warning for missing work on that day, and was advised that another occurrence before the end of the year would "result in probationary status."  Dismissal Request Exhs. at 12.  Plaintiff signed the document.  *Id*.  Her annual performance appraisal for

2006 again rated overall performance at "3" and attendance at "2."  FMLA & Evaluations Exhs. at 16, 23.  Plaintiff signed the appraisal noting that to "improve on absentism (sic), shouldn't be a problem since my aneurysm has been fixed now.  THX!"  *Id.* at 17.

**D.   2007 – "Call-In" Problems & Third FMLA Leave Request**

The next eight months passed uneventfully.  Then, on March 9, 2007, Plaintiff executed another form "Request For Family And Medical Leave Of Absence," asking for "intermittent" leave over the course of six months from "3/7/07 and end on 8/7/07."  *Id.* at 3.  According to the physician certification, apparently Plaintiff's doctor believed that at some point in 2007, the stent either was reopened, or needed to be reopened to "9 mm."  *See id.* at 5; *see also* Edmondson Depo. at 9.  On March 9th, Plaintiff had complained of a headache and right arm numbness and the doctor scheduled an "follow-up" appointment for April 2nd.  *See* FMLA & Evaluations Exhs. at 5.  Plaintiff's condition and complaints did not cause her physician to impose any work restrictions, however.  The doctor checked that "Yes . . . the employee [is] able to perform work of any kind [and] able to perform the functions of the employee's position."  *Id.*  In response to whether "inpatient hospitalization [is] required," the doctor did not check "Yes" or "No," and, instead, wrote "maybe."  *Id.*

HealthSouth apparently granted leave for the follow-up appointment, but a mix-up ensued regarding other work absences by Plaintiff during the six-month leave period listed in her FMLA leave request.  On June 13, 2007, Jenna Wellbrock again verbally counseled Plaintiff for missing work on "1/8/07, 2/27/07, 3/18/07, 5/29/07, 5/31/07," and advised that another occurrence before the end of the year would "result in written warning."  Dismissal Request Exhs. at 10.

Plaintiff refused to sign.  *Id.*  At some point in 2007, Supervisor Edmondson intervened and asked HRD Goldschmidt to "purge" this discipline because Plaintiff was on "FMLA" leave on those 2007 dates.  *See* Laws Depo. at 15-17, 108; *Edmondson Depo.* at 3, 26-27.  Her intervention appears to have settled the matter and Plaintiff did not believe Supervisors Edmondson or Wellbrock ever retaliated against her for complaining about the FMLA mix-up.  *See* Laws Depo. at 17.  She also did not dispute the assessments for her 2007 performance appraisal, which gave her an overall performance rating of "3" and a "2" to "3" for attendance, with the comments that she "need[s] to watch nonFMLA absences" and "decrease [her] negativity."  FMLA & Evaluations Exhs. at 25; *see also id.* at 26, 30-31.

**E.   February 21, 2008 – Discipline For "Chairs" Insubordination Incident**

CEO Gosney prepared a verbal counseling disciplinary form for Plaintiff on February 21, 2008.  On the prior day, CEO Gosney was speaking with an employee at the nurses' station, where Plaintiff was also sitting, and noticed two burgundy chairs there.  When she asked if "anyone knew how these chairs got to the nurses station, [Plaintiff] responded in a very rude tone, 'You saw me bringing them back here this morning.'"  Dismissal Request Exhs. at 8.

CEO Gosney explained "calmly that we were trying to only keep blue chairs in the nurses station" and "there appeared to an adequate number" of blue chairs there.  *Id.*  Plaintiff responded "'Well what do you expect me to do?' again in a rude tone and escalating."  *Id.*  Because CEO Gosney "had a prior experience" with Plaintiff "responding inappropriately," she "placed a hand on her shoulder and quietly said 'Kathy, calm down, we can go talk in my office.'"  *Id.*  Plaintiff responded "again in a hostile, rude tone of voice 'I am not going to talk to you anywhere.'"  *Id.*  CEO Gosney "replied quietly" that she would have Plaintiff talk to Supervisor Edmondson and left.  *Id.*

Plaintiff refused to sign the counseling form.  *Id.* at 9.  In her deposition, she explained that she disputed certain details of what CEO Gosney wrote, including that her tone was inappropriate.  She also explained that she distrusted CEO Gosney's motives, believing her timing to be "methodical" since

-11-

she in fact earlier saw Plaintiff bring in the burgundy chairs.
*See* Laws Depo. at 44-48.  However, there is no dispute that
Plaintiff told CEO Gosney that she was not going to speak with
her and that, had CEO Gosney asked her to remove the chairs,
Plaintiff would have refused to do so.  *See id.* at 48-50, 56.
Thus, the significant aspect of the discipline form –
Plaintiff's public defiance of CEO Gosney – is undisputed.

**F.   June 23, 2008 – Discipline For Attendance Issues But No Request For Accommodation Schedule**

    Throughout 2008, Plaintiff also was not under any
limitations from her doctor.  *See id.* at 30.  Nor did she submit
any requests for leave under the FMLA.  *See id.* at 25.  She did
continue to have absence problems, however, and missed at least
one day a month during the first six months of 2008.  *See*
Dismissal Request Exhs. at 6.

    Though she was "still suffering from the hypertension and
low endurance," by this point Plaintiff "thought [the residual
aneurysm issues were] coming to a close.  The headaches were
becoming few and far between."  Laws Depo. at 25-26.  She missed
work only once for "low endurance" and perhaps one or more times
was a "headache," but not all of her "call offs" in 2008 were
for those medical reasons.  *See id.* at 26-27.  Furthermore,
HealthSouth had no reason to know that any those absences were
for reasons Plaintiff attributed to her aneurysm condition

because Plaintiff never mentioned why she was "calling off." She "never gave them an excuse [and] never told them what was going on [she would] just say 'I'm sick,'" because she "didn't feel it was any of their business." *Id.* at 27.

CNO Fey began working on May 5, 2008, and took over scheduling from Supervisor Edmondson. *See* Fey Depo. at 11-12; Fey Aff. ¶ 1; Edmondson Depo. at 2; Doc. #22-7 at 1, ¶ 2 (hereinafter "*Edmondson Aff.*").  On June 23, 2008, CNO Fey gave Plaintiff verbal counseling for all the work she had missed so far that year on "1/24/08, 2/15/08, 3/13/08, 4/2/08, 5/27/08" and advised her that another occurrence before the end of the year would "result in a written warning."  Dismissal Request Exhs. at 6. Plaintiff and Supervisor Edmondson consider CNO Fey solely responsible for this "write up," but Supervisor Edmond's signature does also appear on the discipline sheet. *Id.; see also* Edmondson Depo. at 5.

Plaintiff worked a schedule that consisted of a twelve-hour shift, three times a week. *See* Laws Depo. at 32, 38.  She did not specify what days of the week she worked, or which shifts she worked, other than to say that "sometimes" she would be scheduled for "two days in a row, 12-hours shifts." *Id.* at 32. The record supports the conclusion that employees had input to their schedules.  Indeed, Plaintiff's deposition reveals that employees either provided supervisors with their schedule

availability, or made requests to a tentative schedule before one was finalized. *See id.* at. 34 ("I handed her the schedule . . . I gave her my paper and I put tentative, my schedule that I would work."); *c.f.* Laws Aff. ¶¶ 10-11 ("[W]hen I first started working at HealthSouth, I could work two double-shifts in a row. After my aneurysm, I could no longer work evening, three 12-hour shifts in a row."); Doc. #40-1 (entitled "PTO Request Form").

Contrary to the suggestion in briefing, no one indicated that Plaintiff requested a schedule accommodation due to her surgeries or that Supervisor Edmondson on her own accord made any changes to Plaintiff's schedule to accommodate her condition. By the same token, no one indicated that supervisors routinely scheduled Plaintiff (or any other nurse) for shifts three days in a row, or that they would have done so over a nurse's protest. The few documents in the record indicate that all nurses were routinely scheduled, at most, for two days in a row on the same shift, then followed by two full days off between the next work day of the week. *See* Doc. #40-1 at 1-3.

At some point during the summer, however, CNO Fey scheduled Plaintiff to work three consecutive twelve-hour shifts. Plaintiff said nothing about the situation, and did not request a different schedule, because her "endurance was improving" and

she "thought [she] could do it." Laws Depo. at 39.[4]  On the last day of this schedule, she discovered her endurance "wasn't as good as I thought it would be," and she could not "handle" the "last four hours of the third day." *Id.* at 38-39.  Plaintiff complained and "wept" to Supervisor Edmondson about the situation, but never mentioned anything to CNO Fey. *See id.* at 37-39; *see also* Laws Aff. ¶ 12.

Nothing in Edmondson's deposition and affidavit indicate that she said anything to CNO Fey about the situation, either. Plaintiff stated that, if Fey had ever scheduled her for consecutive shifts again, then she would have "said something," but Plaintiff did not recall ever having to do so again. Indeed, her "desire not to work three straight 12-hour shifts" was not "a problem or controversy."  Laws Depo. at 39-40.

## G.   Early September 2008 – Time Off For Angiogram Check

In August 2008, Plaintiff requested to use a combination of accumulated paid time off and "extended" sick leave for four days off during early September 2008.  When combined with scheduled days off, the request would have Plaintiff off of work from September 4, 2008 to September 14, 2008, and returning to work during the week of September 15, for 12-hour shifts from

---

[4] *See also* Laws Depo. at 31 (A: "Endurance.  I was under anesthetic for 12 hours the first one and close to 12 the second, and anesthetic really knocks you out, I mean just zaps you.  Q: But the time frame of 2008, apparently then you were improving; is that right?  A:  I believe I was.").

6:00 a.m. to 6:00 p.m. on Monday, Tuesday, and Friday.  *See* Doc. #40-1 at 3-4.  Plaintiff informed Fey that she would need the four days off for a "cerebral angiogram."

Although Fey initially misunderstood the nature of the medical procedure, and thought Plaintiff was having a "stent" placement, Supervisor Edmondson clarified the situation for CNO Fey, and there is no dispute Plaintiff was granted the leave. Likewise, there is no dispute that Plaintiff did not submit her request as FMLA leave.  *See* Laws Depo. at 25-26, 34-38.

**H.  September 16, 2008 – Vicodin Charting Incident**

On September 16, 2008 at "1630" Plaintiff wrote on the "Physician's Orders" form of a patient's chart to "D/C Vicodan (sic) per wifes (sic) order!"  Doc. #23-11 at 1.  The pharmacist carried out the discontinuation of the medication as "OK'd per wife's order."  Doc. #23-10 at 1.

Plaintiff believed her action was justified because the wife had "power of attorney."  *See* Laws Depo. at 67-68.  She did not think what she wrote had the effect of a "viable order" because she "did not cosign a doctor's name."  *Id.* at 70; *see also id.* at 71-72.  She does not dispute, however, that she could not issue a physician order unless she first conferred with the physician and asked to enter the order, *see id.* at 71-72, or that it was her decision alone to put the note on the

"physician's order" form, rather than the "progress notes or the rounding sheets or both," *id.* at 70.

Two days after Plaintiff made the note, on September 18, 2008 at "1830," another nurse wrote on the "Data / Intervention / Patient Response" form of the patient's chart that the "patient was crying and holding [his left] arm," and when asked if he was in pain "patient nodded and said yes."  Doc. #23-9 at 1.  Yet another nurse explained that although the patient had been taking the medication one to two times a day, but that the medication had been discontinued per Plaintiff's notation.  *Id.*

The nurse who discovered the problem called the patient's wife, explained the patient was "crying and [illegible] in pain . . . not sleeping at night and . . . Vicodin helped before." *Id.*  The wife agreed to have the medication restarted.  The nurse then called "CNO," who explained it was "OK to give Vicodin" since Plaintiff's entry was not a "legal order to discontinue it." *Id.*  The nurse also left a note in the doctor's report, asking "to clarify Vicodin order." *Id.*

## I.    September 18, 2008 – Fey Response To Vicodin Incident

CNO Fey first learned of the incident on September 18, 2008, the day it was reported to her.  *See* Fey Depo. at 91. Having remedied the situation by reinstituting the patient's medicine, CNO Fey did not believe that leaving Plaintiff on the floor would put any patients in "harms way." *See id.* at 90-91.

According to Supervisor Edmonsdon, CNO Fey asked her to speak to Plaintiff about the situation, but did not indicate that the Vicodin incident "was that big of a deal," Edmondson Depo. at 17, or request her to "issue any discipline for it," *id.* at 18. During their subsequent conversation, both Supervisor Edmondson and Plaintiff recognized that Plaintiff had acted improperly. Supervisor Edmondson told Plaintiff "'you know you can't do this,'" and that if she wanted to "put that in to progress note to alert the doctor, that's fine. But writing it as an order [was incorrect]'". *Id.* at 17. Plaintiff replied, "'I know I can't . . . I know that . . . It won't happen again.'" *Id.*

Nevertheless, CNO Fey believed the incident was "serious" enough to investigate with the Kentucky Board whether it was a "reportable" offense, and so she called to inquire. She believed that it took several days to receive an answer. Once she received confirmation that that the event was "reportable," she began composing the letter to the Board to document the event. According to CNO Fey, she consulted with CEO Gosney about the wording of the letter. *See* Fey Depo. at 71-75. CEO Gosney's and HRD Goldschmidt's depositions, however, indicate that they were unaware about the Vidocin incident prior to October 1st. *See* Doc. #25-1 at 33, 35, 57-58 (hereinafter "Gosney Depo."); Goldschmidt Depo. at 18-19; 53-54.

**J.    Controversial September 16, 2008 Fey Signature**

CNO Fey began Plaintiff's 2008 annual performance review in the Summer of 2008.  *See* Fey Depo. at 97 (document on jump drive, entitled "Laws K 08.doc," created "7/17/08"); *see also* Edmondson Depo. at 16-17 (CNO Fey did not discuss evaluations with her that Summer).  This new form does not contain an "attendance" section as in the prior years, but "regular attendance and reporting on time to work" is listed as a "requirement of the position."  *See, e.g.,* FMLA & Evaluations Exhs. at 39-40.  This document is signed "Debra S. Fey, RN CNO 9/16/08."  *Id.* at 40.  Fey claims this "was not intended to go into file" and "has "no idea" how her signature came to be affixed to it."  Fey Depo. at 98-108.

**K.    October 1, 2008 – CEO Gosney Discipline Form For "Fearless Leader" Incident**

On October 1, 2008, in the morning, CEO Gosney noticed a coffee cup sitting on a dirty laundry hamper, which is "an infection control issue" and gives rise to the HealthSouth policy that "employees are not permitted to have personal drinks in patient care areas."  Gosney Depo. at 13, 14; *see also* Dismissal Request Exhs. at 4.  When CEO Gosney noticed the cup, Plaintiff was standing nearby, just inside a patient's room, and a technician was inside the patient's bathroom assisting the patient.  When CEO Gosney asked Plaintiff who the cup belonged

to, Plaintiff replied she did not know, "[m]aybe hers . . . nod[ding] her head toward the bathroom.  Gosney Depo. at 14.

When someone from the bathroom inquired, "Who is that?," Plaintiff, "in a very mocking, derogatory tone . . . said, 'Our fearless leader' . . . 'Ms. Brenda Gosney.'"  *Id.*  Because this was delivered in an insubordinate tone, in front of another employee and a patient, and because CEO Gosney had other inappropriate interactions with Plaintiff, she went to speak with CNO Fey.  *See id.* at 11-17, 28.

According to CEO Gosney, she approached CNO Fey immediately after the "fearless leader" incident to report it.  Both agree on that point.  *See id.* at 11-12, 50; Fey Depo. at 53, 57-58.  Both also agree that during this conversation, CNO Fey brought up the topic of her the concern about Plaintiff "operating outside the scope of practice" for making the entry to discontinue the Vicodin, which CNO Fey was investigating which she believed constituted a 'terminable offense."  *See* Gosney Depo. at 11; 28, 50-51, 54-55.

There is also no dispute that after this conversation, two employee reports immediately issued – an employee disciplinary form complied and signed by CEO Gosney with the "written" box checked, and an employee discipline form compiled and signed by CNO Fey with the "dismissal" box checked.  *See* Dismissal Request Exhs. at 2, 4.

CEO Gosney's form cites her February 21, 2008 verbal warning for the chairs/insubordination incident as well as CNO Fey's June 23, 2008 verbal warning for the 2008 attendance issues. *See id.* at 4. CNO Fey's dismissal form only cites a verbal warning, noting the date that the chairs/insubordination incident occurred. *See id.* at 2.

**L.   October 1, 2008 – CNO Fey Dismissal Form**

After her discussion with CEO Gosney, CNO Fey recommended the suspension and termination. *See* Gosney Depo. at 34, 55. CEO Gosney agreed that for "a nurse to discontinue medication without physician's order [is] terminable" conduct. *See id.* at 66; *see also id.* at 67-68 (same); Goldschmidt Depo. at 53 (they considered probation, but CNO Fey "wanted termination [because Plaintiff] violated her license by writing the orders, and that was a serious infraction.").

CNO Fey's October 1, 2008 dismissal notice provides:

> On the evening of Sept 18, 2008  . . . I received a call . . . from the Charge RN about a situation regarding a patient and his pain medication being discontinued. The Charge nurse asked if an LPN and wife (also POA) could make a decision to discontinue a patient's pain medication.  I told her that only the attending physician could discontinue it but a nurse could make a clinical judgement (sic) to withhold for documented clinical reasons such as low respirations or lethargy for example. The Charge Nurse stated the patient was clearly in need of medication that evening but she was unsure if she could give it.  She stated

-21-

the the (sic) order was written to "D/C Vicodin per wifes (sic) order!" and signed by Kathy Laws, LPN. She further stated the order did not read "verbal order" or "telephone order" indicating the nurse spoke with the physician. No MD subsequently signed the order.

. . . the pharmacist discontinued the order. When discussed with Kathy, she said she thought the wife could do this as the POA. This discussion was held in the presence of Brenda Gosney, CEO and Diane Goldschmidt, HR.

**Corrective Action Plan: Kathy will be placed on suspension for 3 days until a complete investigation takes place. If it is upheld, she will be terminated based on failure to adhere to basic nursing standards that include[,] but are not limited to[,] not take orders from anyone other than an MD or DDS per Kentucky Board of Nursing Standards.**

Dismissal Request Exhs. at 2 (emphasis original).

Later that day, CEO Gosney, HRD Goldschmidt, and CNO Fey held a meeting with Plaintiff. *See, e.g.,* Laws Depo. at 58. As for the "fearless leader" incident, Plaintiff does not dispute that the cup in fact posed an infection control issue and the employees are not permitted to have drinks in patient areas. *See id.* at 51-52. Nor does she dispute that when the technician asked who was speaking, Plaintiff replied, "'Ms. Brenda Gosney, our fearless leader.'" *Id.* at 52-53. She believed the write up was "unwarranted," however, because she did not think her comment was offensive and she said it for the purpose of cueing

the technician to "settle down."  *See id.* at 53-54,58.  She refused to sign the written employee disciplinary form.  *See* Dismissal Request Exhs. at 5.

It is not clear whether Plaintiff saw the Fey dismissal form during this meeting.  Fey signed the form, but the other signature slots are blank.  *See id.* at 3. Plaintiff maintains they simply informed her that she was suspended.  *See* Laws Depo. at 59.  Even if she did not see CNO Fey's form, Plaintiff clearly knew the basis for her suspension per that meeting.  She immediately contacted a lawyer and the Kentucky Board of Nursing "RE:  Legal question:  Practicing beyond scope."  She received a response on October 2nd that her question was being forwarded to "Sharon Mercer, the Board's Practice Consultant."  Doc #23-8 at 2 ("Plf. E-Mails"); *see also* Laws Depo. at 61.

**M.   October 1, 2008 – Goldschmidt Memorandum**

CNO Fey recommended termination and both CEO Gosney and HRD Goldschmidt "supported" it, but HRD Goldschmidt was the one who transmitted their recommendation to "corporate" for a final decision.  *See, e.g.,* Fey Depo. at 45, 51-57.  Her transmittal memorandum to Regional Director Koehler provides in full:

> We are requesting termination of Kathy Laws, LPN.  We have put her on a 3 day suspension pending the investigation of her writing an order to discontinue a patient's medication without obtaining orders from a Physician. It was brought to the attention of the CNO by the Charge Nurse, that Kathy had written

on the MAR to discontinue a narcotic per the wife's order. The pharmacist on duty discontinued the medication. When discussed with Kathy, she said she thought the wife could do this as the POA. Per the Kentucky Board of Nursing, nurses are only permitted to take orders from an MD or DDS.

Kathy has had other disciplinary issues in the past including attendance and rudeness to the CEO in front of other employees and patients including and incident that occurred on 10/1/08. Please see attached disciplinary forms.

I will need an answer on the termination by Monday 10/6/08.

Dismissal Request Exhs. at 1. The attachments to the transmittal memorandum included:

(1) CNO Fey's 10/1/08 dismissal form;
(2) CEO Gosney's 10/1/08 fearless leader discipline form;
(3) CNO Fey's 5/23/08 verbal discipline form for 2008 attendance issues;
(4) CEO Gosney's 2/21/08 chairs/insubordination discipline form;
(5) Supervisor Wellbrock's 6/13/07 verbal discipline form for the 2007 attendance issues that Supervisor Edmondson testified HRD Goldschmidt was to have purged from the file as some to the dates included intermittent FMLA leave;
(6) Supervisor Wellbrock's 8/13/06 verbal discipline form for Plaintiff having missed work one day in August 2006;
(7) Supervisor Wellbrock's 4/3/06 verbal discipline form for the earlier 2006 attendance issues that Plaintiff contested were excused by a doctor or necessitated by her cat's illness;
(8) Supervisor Bean's 4/29/03 verbal discipline form for the 2003 attendance issues.

*Id.* at 2-17.

In other words, HRD Goldschmidt copied Plaintiff's entire disciplinary file, as both she and Regional Director Koehler

testified was standard operating procedure. *See* Goldschmidt Depo. at 23 (with any employee termination, "HealthSouth Corporate Office wants the whole history of any disciplinary actions [and so she] send[s] them everything that's in the file."); *id.* at 45 (same); Koehler Depo. at 11 ("In my process, and today, if I had another termination request, I would be provided a history, like we see here, of disciplinary actions. And those disciplinary actions, while they may not have any bearing on the current situation whatsoever, they are the history, only to demonstrate this individual has had a history of performance or attendance or whatever the case may be. Performance-related issues.").

## N.   Regional Director Koehler Gives Approval To Fire Plaintiff

HealthSouth's corporate structure and protocol is not in dispute.  "Corporate" has final approval over requests to terminate an employee.  Therefore, while the local CEO, CNO, HRD "leadership" is "involved" with termination decisions, Regional Director Koehler was the "ultimate decisionmaker.[5]  He reviewed

---

[5] *See* Goldschmidt Depo. at 18 (she "did not make [termination] decisions" and instead, "[o]nce the supervisor was requesting termination, [she] put together the paperwork and then sent that down to Joseph Koehler, requesting an okay for a termination."); *see also id.* at 47 (reiterating same); Gosney Depo. at 10-11, 72, 129-30 (she concurred with the HRD Goldschmidt's and CNO Fey's recommendation to terminate Plaintiff; "corporate" must "approve" a recommendation of termination and thus is the "ultimate" decisionmaker); Koehler Depo. at 8 (local "HR director and the hospital managers are responsible for [conducting the] investigation"); *id.* at 21-23 (although "leadership at the hospital" were also "involved," he was the "decisionmaker" who gave final approval); Koehler Aff. ¶ 2 ("all terminations at HealthSouth have to be approved by the corporate

HRD Goldschmidt's "recommendation," the documentation submitted with it, followed up with a call to HRD Goldschmidt to discuss the results of the investigation of the Vidocin incident, and gave his permission to follow through with termination.  He was adamant that the attendance issues had nothing to do with his decision and that the sole basis for his decision was Plaintiff's discontinuation of the patient's Vicodin.  *See* Koehler Depo. at 6, 9-19; *see also* Koehler Aff. ¶ 4 ("This action alone warranted termination.  I did not take Mrs. Law['']s history of disciplinary actions for absenteeism into consideration.").

**O.   Subsequent Events**

On October 2, 2008, Plaintiff received the response from the Board that it is outside the scope of "licensed practical nursing practice to write an order to discontinue a medication unless you are receiving a verbal order and have notice it as such," and that because Plaintiff was not noting a "verbal order, she was "practicing outside your scope of practice." Plf. E-Mails at 2.[6]  The next day, Goldschmidt called Plaintiff

---

office.  I review and render decision on termination requests in the Mid-Atlantic Region."  This includes the hospital in Edgewood, Kentucky.").
[6] Violations of local laws and regulations also violate HealthSouth's internal policies.  *See* Doc. ##23-2 – 23-5 (internal training or employee manual document and Laws acknowledgement of receipt; provides in part that "HealthSouth will comply with federal, state, and local laws and regulations . . . You are expected to know the basic laws and regulations that apply to your job.  If you have questions, ask a supervisor or contact one of the Company resources.").

to let her know of Koehler's decision and that she was fired "because of the pain incident."  Goldschmidt Depo. at 48.

### Discrimination Cases & Summary Judgment Standard

"The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Schoonmaker v. Spartan Graphics Leasing, LLC,* 595 F.3d 261, 264 (6th Cir. 2010) (internal quotations and citations omitted).  A plaintiff can prove discrimination by direct or circumstantial evidence.  *See, e.g., Geiger v. Tower Automotive,* 579 F.3d 614, 620 (6th Cir. 2009) (ADEA context); *Crawford v. TRW Automotive U.S. LLC,* 560 F.3d 607, 613 (6th Cir. 2009) (ERISA context), *cert. denied,* 130 S. Ct. 1068 (2010); *Burus v. Wellpoint Companies, Inc.,* No. 10-5470, 2011 WL 3444311, at *6 (6th Cir. Aug. 8, 2011) (ADA context); *Clark v. Walgreen Co.,* 424 F. App'x 467, 472-73 (6th Cir. 2011) (FMLA context).  "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Geiger,* 579 F.3d at 620 (internal quotation and citation omitted).  On the other hand, "[c]ircumstantial evidence . . . is proof that does not on its face establish discriminatory animus, but does allow a

factfinder to draw a reasonable inference that discrimination occurred." *Id.* (same).

In a circumstantial evidence case, the Sixth Circuit has "long found the *McDonnell Douglas* framework useful in analyzing evidence . . . of [the discrimination] claims." *Id.* at 622; *see also Crawford,* 560 F.3d at 613 ("Plaintiffs may make this showing either through direct or circumstantial evidence, with the latter via the ubiquitous [*McDonnell Douglas*] burden-shifting framework that has, like some B-movie villain, devoured nearly every area of law with which it has come into contact."). As Plaintiff's response attests, the theory of recovery for which she asserts direct evidence, and the one she affords most weight, is her FMLA claim.  For all of her claims, however, she relies on circumstantial evidence to establish a prima facie case.  *See* Doc. #31 at 12 ("Response"). HealthSouth argues that Plaintiff cannot show direct evidence of discrimination, and/or a prima facie case, and/or that the proffered reasons for her discharge are pretextual.  *See* Doc. #21-1 ("*MSJ*").

Plaintiff generally maintains that summary judgment is "rarely appropriate" when the "motivation, intent, or state of mind" of the employer is at issue.  Response at 10.  She relies on *Ross v. Campbell Soup Co.,* 237 F.3d 701, 706 (6th Cir. 2001), for this proposition, but the applicable statement she cites was one made by the district court, not the Sixth Circuit.  Although

there are plenty of decisions that observe the difficulty in granting summary judgment when motive or intent is at issue, summary judgment is not foreclosed simply because a case involves such issues.  *See, e.g., Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989 ("Cases involving state of mind issues are not necessarily inappropriate for summary judgment.").

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Thus, even in a discrimination case, summary judgment in favor of Defendant is appropriate if Plaintiff "fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial."  *Whitfield v. Tennessee,* 639 F.3d 253, 258 (6th Cir. 2011) (internal quotations and citations omitted).

### *Analysis Of Plaintiff's Prima Facie Showings*

Generally speaking, if a plaintiff fails to establish each element of a prima facie case, then no further analysis is required and a defendant would be entitled to summary judgment.[7]

---

[7] *See Gantt v. Wilson Sporting Goods Co.,* 143 F.3d 1042, 1048 (6th Cir. 1998) ("Because she has not established a prima facie case . . . under the

Though the relevant statutes contain some overlapping inquiries, they all require different proof.  Except perhaps with the exception of one narrow aspect of one of Plaintiff's FMLA claims, she fails to establish one or more of the requisite prima facie elements.

**A.    ADEA Claim (Counts V and VI).**

The standards for the ADEA and KCRA are the same, so the Court's ADEA analysis here subsumes the state claim.  *See, e.g., Sharp v. Aker Plant Servs. Group, Inc.,* No. 3:09-CV-429-S, 2011 WL 864952, at *3 (W.D. Ky. Mar. 11, 2011) (citing *Allen v. Highlands Hosp. Corp.,* 545 F.3d 387, 393-94 (6th Cir. 2008)). In contrast to Title VII, the ADEA prohibits "discharge . . . because of . . . age," and the Supreme Court held this language does not authorize a "mixed-motives" ADEA claim.  *Gross v. FBL Financial Services, Inc.*, ___ U.S. ___, ___, 129 S. Ct. 2343, 2350 (2009).[8]  An employer takes adverse action "because of" age,

---

*McDonnell Douglas* burden shifting procedure the court's analysis is over and there is no need to address the question of pretext.");  *Monette v. Electronic Data Systems Corp.,* 90 F.3d 1173, 1185 (6th Cir. 1996) ("If the plaintiff fails to establish a predicate fact necessary to create the presumption of unlawful intent, technically the 'burden' never shifts to the defendant.");  *Green v. Fidelity Investments,* 374 F. App'x 573, 577 & n.4 (6th Cir.) ("[T]his court routinely affirms the grant of summary judgment for failure to establish a *prima facie* case based on the *McDonnell Douglas* criteria. [in footnote] we need not reach the issue whether Fidelity's stated reason for his firing was pretextual."), *cert. denied,* 131 S. Ct. 598 (2010).

[8] Congress "amended Title VII to allow for employer liability when discrimination 'was a motivating factor for any employment practice, even though other factors also motivated the practice,' . . . but did not similarly amend the ADEA."  *Gross,* 129 S. Ct. at 2350 n.3.

only when age was the "reason" for the employer's decision. This means age must have "'actually played a role . . . and had a determinative influence on the outcome.'"  *Id.* (quoting *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610 (1993)) (emphasis omitted).  Likewise, under state law, "there is no mixed-motive theory of recovery available to plaintiffs under the Kentucky Civil Rights Act."  *Breen v. Infiltrator Systems,* 417 F. App'x 483, 488 (6th Cir. 2011) (citing *Macy v. Hopkins County Sch. Bd.,* 484 F.3d 357, 363–64 & n.2 (6th Cir. 2007), and *Monette v. Electronic Data Systems Corp.,* 90 F.3d 1173, 1178 (6th Cir. 1996)).

The import of the *Gross* decision is not entirely settled. However, in a post-*Gross* decision, the Sixth Circuit reiterated that a plaintiff can establish age discrimination by direct or circumstantial evidence, but in either situation retains the burden of persuasion "to demonstrate 'that age was the but-for cause of their employer's adverse action.'"  *Geiger,* 579 F.3d at 620 (quoting *Gross, Inc.*, 129 S. Ct. at 2451 n.4).  Here, the only "direct evidence" of discrimination Plaintiff asserts is in connection with her FMLA claim.  *See* Response at 12.  To prove her ADEA claim, Plaintiff relies on the circumstantial evidence approach.  *See id*. at 25–26.  And because this is a circumstantial evidence case, notwithstanding the *Gross* decision, under the law as it presently stands in the Sixth

Circuit, the "*McDonnell Douglas* framework can still be used to analyze ADEA claims." *Geiger,* 579 F.3d at 622; *see also, e.g., Schoonmaker,* 595 F.3d at 264, n.2.

A classic expression of the framework in the age discrimination context is that to establish a prima facie case, Plaintiff must show:  first, she was a member of the protected class, meaning over forty years of age; second, she was discharged; third, she was "qualified" for the position she held; and, fourth, HealthSouth replaced her with someone who falls outside the protected class. *See, e.g., Grubb v. YSK Corp.,* 401 F. App'x 104, 113-14 (6th Cir. 2010) (citing *Geiger,* 579 F.3d at 622); *Jones v. Shinseki,* ___F. Supp. 2d ___, ___, No. 3:09-CV-0688, 2011 WL 3154696, at *6 (M.D. Tenn. Jul. 26, 2011) (same).  An alternative showing for the fourth prong in disparate treatment age discrimination case is the notion of comparatively different treatment.  Thus, in "disparate treatment cases, the fourth element may be replaced with the requirement that the plaintiff show she was treated differently from similarly-situated individuals." *Policastro v. Northwest Airlines,* Inc.  297 F.3d 535, 539 (6th Cir. 2002); *see also, e.g., Badertscher v. Procter & Gamble Mfg. Co.,* 405 F. App'x 996, 997 (6th Cir. 2011); *Grubb,* 401 F. App'x at 114, n.6. HealthSouth contends Plaintiff fails to establish the third and fourth prongs.

*(1) "Qualified."* HealthSouth argues that because Plaintiff was insubordinate and discontinued pain medication, she was not performing to its "reasonable satisfaction" or doing "what was expected" of her in her job.  In other words, Plaintiff was "unqualified" because of the conduct that led to her being fired.  As Plaintiff notes, however, the Sixth Circuit has long and expressly rejected consideration of firing justifications at the prima facie stage.  *See* Response at 26.

A court "'*may not* consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case,'" because doing so "'would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination.'"  *Idemudia v. J.P. Morgan Chase,* 2011 WL 3648219 at *5 (6th Cir. 2011) (emphasis added) (quoting *Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 574 (6th Cir. 2003) (en banc)); *see also, e.g., Schoonmaker,* 595 F.3d at 264.  Instead, at this stage the court is to "focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job.'"  *Idemudia,* 2011 WL 3648219, at *5 (quoting *Wexler,* 317 F.3d at 575).

In reply, Healthcare takes no issue with the above law or Plaintiff's objective qualifications.  *See* Doc. #33 at 12-14

("Reply"). Indeed, Plaintiff was a licensed and experienced nurse of long-standing even before she became employed at HealthSouth. *See, e.g.,* Laws Depo. at 6-7. Accordingly, the Court finds Plaintiff satisfies the third prong of the prima facie case.

 *(2)* **"Replaced."** Plaintiff was fifty-five years old at the time of her termination. *See, e.g., MSJ* at 10. She points to two employees who were hired within a year of her being fired. The male LPN, hired a year later, "was born in 1963" and the female RN, hired five months later, "was born in 1964." Response at 28.

 Despite the classic wording of the fourth prong, the replacement hire does not have to fall "outside" the protected class. That is the case here, as the two replacement hires Plaintiff cites fell within the "protected class [of] all workers 40 years old or older." *See Corrigan v. U.S. Steel Corp.,* 478 F.3d 718, 727 (6th Cir. 2007). It will suffice if they were "significantly younger," which means they were at least eight years younger than Plaintiff when she was replaced. *Id.* at 727; *see also Grosjean v. First Energy Corp.,* 349 F.3d 332, 340 (6th Cir. 2003) (less than six years presumptively insignificant, but eight to ten years younger qualifies as significant). The individuals Plaintiff cites were approximately forty-five years old when they were hired and

-34-

thus, at least eight years and likely ten years younger than Plaintiff.

However, an employer is considered to have "replaced" the plaintiff "'only when another employee is hired or reassigned to perform the plaintiff's duties.'" *Grosjean,* 349 F.3d at 336 (quoting *Barnes v. GenCorp, Inc.,* 896 F.2d 1457, 1465 (6th Cir. 1990)). Thus, if another existing employee temporarily takes on the plaintiff's responsibilities by working overtime until the company eventually hires someone else to fill the vacant position, "replacement" occurs when the new person is hired. *See, e.g., Jones,* ___F. Supp. 2d at ___, 2011 WL 315496, at *6 (citing *Grosjean,* 349 F.3d at 336). Conversely, a "'person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work.'" *Id.* (same).[9]

HealthSouth argues that Plaintiff cannot show it "replaced" her with a younger employee because Plaintiff submits no evidence showing that HealthSouth tried to fill Plaintiff's vacant position or that the LPN or the RN worked the same

_____

[9] The latter legal proposition arose in a reduction in force situation where a heightened prima facie standard ultimately applies to the fourth prong. *See Geiger*, 579 F.3d at 623-24; *Schoonmaker,* 595 F.3d at 265. While HealthSouth relies on this notion, it does not contend that Plaintiff was fired under a reduction in force (or that it decided to institute one by not replacing her).

"shift" as Plaintiff.  *See MSJ* at 10 (citing *Barnes*); *see also* Reply at 13-14.[10]

On this state of the record, while Plaintiff has submitted evidence tending to show that HealthSouth hired two significantly younger people to work after she was fired, she does not supply the link between their hiring and performance of her former duties.  Accordingly, she fails to show she was "replaced" as one alternative to meet the fourth prong of the prima facie case.

**(3) "Similarly-Situated."**  Decisions often attribute the "similarly-situated" showing to the Sixth Circuit's decision in *Mitchell,* which explained that the requirements are stringent:

> It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of [other] employees, the plaintiff must show that the "comparables" are similarly-situated in all respects. *Stotts v. Memphis Fire Department,* 858 F.2d 289 (6th Cir. 1988). Thus, to be deemed "similarly-situated," the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would

---

[10] CEO Gosney answered "yes," to the question whether she was "around when Ms. Laws' replacement was hired," but stated she did not recall in response to the question of "who was [Plaintiff's] replacement."  Gosney Depo. at 72; *see also id.* at 142, 152-55. However, the Court has not discovered any other deposition testimony or documentary evidence that points to whether the employee characterized by Plaintiff's counsel as a "replacement" worked Plaintiff's shift.

> distinguish their conduct or the employer's
> treatment of them for it.

*Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582-83 (6th Cir. 1992);

*see also, e.g., Henry v. Delta Air Lines, Inc.,* No. 2:10-CV-

00009-WOB, 2011 WL 3444089, at **8-9 (E.D. Ky. Aug. 8, 2011).

Plaintiff's proffered evidence fails to meet this standard.

In support, she cites three nurses in their twenties.  One was

not terminated for failing to "document vital signs for a liver

transplant patient" and only verbally reprimanded for attendance

issues.  Response at 27.  Another was placed on probation for

failing to "properly chart vital signs" and not fired when the

same conduct occurred a week later. *Id.*  Another was placed on

probation for entering a note in a chart that a patient received

medication when the medicine was later found in a drawer.  *Id.*

None of these incidents are similarly-situated in all

respects with the charting error Plaintiff made.  Even assuming

the three young nurses dealt with the same supervisor, the

undisputed and different circumstance between their conduct and

Plaintiff's was that Plaintiff made a chart entry in the section

for doctors' orders that discontinued a patient's pain medicine

without a doctor having ordered the change, and her unilateral

decision resulted in a patient in tears telling a nurse he was

in pain.  *See* Laws Depo. at 69-71; Gosney Depo. at 139-40;

*compare* Goldschmidt Depo. at 52-53 (she recalled HealthSouth

fired two RN's for stealing patient medications), *with* Fey Depo. at 73-74 (the discontinuation note was the most "serious" infraction she had seen in thirty years of nursing and noting that stealing patient mediations, while "serious" and "reportable," may not necessarily have resulted in harm to patient).  Accordingly, Plaintiff fails to establish a genuine issue on the other alternative to the fourth prong as well.

*(4) Catch-All Alternative For Fourth Prong.*  Plaintiff appears to posit another alternative as a means to satisfy the fourth prong.  If the Court understands correctly, she maintains that she can satisfy the last necessary element of a prima facie case by showing:  "that additional direct or circumstantial evidence exists that shows that the employer was motivated by her age or disability in making its decision."  Response at 25.[11] However, the only evidence she submits for the fourth prong is the new hires and comparative discipline examples discussed above.  *See id.* at 27-28.

Furthermore, this "catch-all" alternative is inapplicable as a matter of law because the Sixth Circuit recently rejected this sort of argument.  In that case, the plaintiff could not

---

[11] Specifically, she asserts the fourth prong requires her to show either that: "she was *replaced* by someone outside the protected class, she was *treated differently* than similarly situated employees outside the protected class, *or that additional direct or circumstantial evidence exists* that shows that the employer was motivated by her age or disability in making its decision."  Response at 25 (emphasis added).

show "replacement" or "a similarly situated younger person who was treated better," and wanted to substitute "other circumstantial evidence of discrimination." *Green v. Fidelity Investments,* 374 F. App'x 573, 577 (6th Cir.) (internal quotations and citations omitted), *cert. denied,* 131 S. Ct. 598 (2010).  The *Green* decision acknowledged that the *McDonnell Douglas* test should not be formalistically applied, but held that the "fact that [the plaintiff] cannot establish a prima facie case under the framework is not itself a sufficient reason to dispense with the test in favor of a more forgiving standard."  *Id.*  Finally, the cases Plaintiff seemingly cites in support of the catch-all alternative fail support her position.[12]

**B.    ADA Claim (Counts I and II).**

   **(1) *Clarifications On Applicable Law.***  Several points require clarification at the outset.  While Plaintiff's complaint does not specify which section of the ADA affords her relief, the court assumes it is Title I, which "provides that a covered employer 'shall [not] discriminate against a qualified

---

[12] Notably, all of them pre-date the *Gross* decision.  Also, one is a state disability case.  *Howard Baer, Inc. v. Schave*, 127 S.W.3d 589, 592 (Ky. 2003).  Another discusses the prima facie showing in a reduction in force case.  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998).  One established the "substantially younger" criteria for the "replacement" analysis.  *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313 (1996).  The last is a Title VII case where a footnote illustrated that the prima facie elements did not have the alternative Plaintiff cites, and discussed the relationship between the prima facie case the ultimate plaintiff burden of persuasion on the issue of intentional discrimination.  *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253-56 & n. 6 (1981).

individual on the basis of disability in regard to . . . discharge of employees.'" *Whitfield,* 639 F.3d at 258 (quoting 42 U.S.C. § 12112(a)).  Also, Plaintiff's citation to the Ohio statute disability statute is an evident typographical error in light of her complaint, which asserts a disability claim under the KCRA.  *Compare* Response at 2, *with* Complaint at 5.

For ADA discrimination claims, in the absence of direct evidence, a variant of the *McDonnell Douglas* burden-shifting analysis applies.  *See, e.g., Whitfield,* 639 F.3d at 259; *Talley v. Family Dollar Stores of Ohio, Inc.,* 542 F.3d 1099, 1105 (6th Cir. 2008).  Defendant asserts that the prima facie case for an ADA claim is three-pronged, *see MSJ* at 13-14, but that is not so under current Sixth Circuit law as clarified by the *Whitfield* decision.

As *Whitfield* explains, the "*Mahon* formulation" cited by Defendant, which requires as its final element that plaintiffs show they were subject to an adverse action "solely" because of the disability, forecloses plaintiffs from establishing a prima facie case by indirect evidence using the *McDonnell Douglas* framework.  *Whitfield,* 639 F.3d at 259 (citing *Mahon v. Crowell,* 295 F.3d 585, 589 (6th Cir. 2002)).  Instead, the correct test is the five-prong "*Monette* formulation," which is parallel to that under the ADEA above:

> To make out a prima facie case of employment discrimination through indirect evidence under Title I, a plaintiff must show that "1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Macy v. Hopkins Cty. Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007) (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996)).

*Id.* at 258-59.  Thus, the only cognizable arguments Defendant raises pertain to whether Plaintiff qualifies as "disabled" under the first prong.

Defendant's alleged conduct and the date Plaintiff was fired took place before the amendments to the ADA went into effect on January 1, 2009.  As such, the law as it existed at the time of her termination applies.[13]  Specifically, the stricter definitions of "disability" under the Supreme Court's *Toyota and Sutton* decisions will apply to this case.  *See, e.g., Scott v. G & J Pepsi-Cola Bottlers, Inc.*, 391 F. App'x 475, 479 n.3 (6th Cir. 2010); *see also Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 190-91 (2002); *Sutton v. United Air*

---

[13] *See Milholland v. Sumner County Bd. of Educ.*, 569 F.3d 562, 565 (6th Cir. 2009) ("The ADA Amendments Act of 2008 . . . does not apply retroactively to govern conduct occurring before the Act became effective."); *see also Sharif v. J.C. Penney Corp., Inc.*, No. 3:09-1176, 2010 WL 4659548 at *4, n. 3 (M.D. Tenn. 2010) (citing *Verhoff v. Time Warner Cable, Inc.*, 299 Fed. Appx. 488, 492 (6th Cir. 2008) and *Scott v. G & J Pepsi-Cola Bottlers, Inc.*, 391 F. App'x 475 (6th Cir. 2010)).

*Lines, Inc.,* 527 U.S. 471, 491 (1999). Even with these former definitions applicable, the standards for the ADA and KCRA again are the same, and the Court's analysis applies equally to both. *See, e.g., Bryson v. Regis Corp.,* 498 F.3d 561, 574 (6th Cir. 2007).

> *(2) Major Life Activities Are "Seeing" And "Work."* The 2008 version of the ADA defines "disability" as:

> > (2) Disability

> > The term "disability" means, with respect to an individual-

> > (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

> > (B) a record of such an impairment; or

> > (C) being regarded as having such an impairment.

*Watts v. United Parcel Service,* 378 F. App'x 520, 524-25 (6th Cir. 2010) (emphasis omitted)(quoting 42 U.S.C. § 12102 (2008)). A "substantial limitation" can be the "manner or duration" under which Plaintiff performs "compared to [an] average person in the general population . . . perform[ing] the same major life activity." 29 C.F.R. § 1630.2(j)(I)(ii).

Neither party discusses which "major life activity" of Laws is allegedly impacted, and the regulations list several including "seeing," and "working." *See, e.g., id.* at 29 (citing 29 C.F.R. § 1630.2(I)). The sole "impairment" Plaintiff relies

upon is her aneurysm and the two physical consequences of it –
loss of vision in her left eye and lowered "endurance" that
precluded her from working consecutive twelve-hour shifts three
days in a row.[14]   Thus, the Court will assume Plaintiff is
asserting that the impacted "major life activity" is "seeing"
and "work."

 **(3) *Plaintiff Fails To Show An Actual Disability.***  Simply
having a medical condition is insufficient to establish a
"disability" within the meaning of the ADA.  "Minor" impairments
also do not suffice.  *See, e.g., Bryson,* 498 F.3d at 575 (citing
*Toyota*, 534 U.S. at 195-96).  Nor does preclusion from one type
of work such as the pilots with severe myopia in *Sutton* who were
deemed "substantially limited" in their ability to fly aircraft.
*Id.* at 576 (citing *Sutton,* 527 U.S. at 493).  A plaintiff
instead must show that she is "'significantly restricted in
ability to perform either a *class* of jobs or a *broad range* of

---

[14] Plaintiff's arguments for finding her disabled are:

> Laws permanently lost normal vision in her left
> eye, and that her aneurysm was made quite visible
> by her droopy left eye lid. . . . This is
> sufficient by itself to demonstrate a question of
> fact as to Laws' disability status.  It is also
> undisputed that Laws' endurance deteriorated
> precipitously after her aneurysm, limiting the
> hours she could work and that Fey was aware of this
> limited endurance.  This is sufficient to establish
> a jury question . . . and summary judgment is not
> appropriate.

Response at 30.

jobs in various classes.'"  *Id.* (quoting 29 C.F.R. §
1630.2(j)(3)(i)) (emphasis added); *see also, e.g., Milholland v.
Sumner Cty Bd. of Educ.,* 569 F.3d 562, 568 (6th Cir. 2009)
(citing same).

Plaintiff's passing mention of the one isolated instance
where her relative lack of endurance forced her to leave four
hours early is utterly insufficient for her to sustain her
burden.  No doctor put her under any sort of restriction due to
her aneurysm.  She never requested a schedule accommodation due
to her lack of endurance.  Instead, she worked full schedules
while simultaneously being able to pursue her ordinary daily
activities and has been looking for work ever since she was
fired.  *See, e.g.,* Laws Depo. at 30-33.

The undisputed evidence establishes that Plaintiff had
nothing other than minor impairments following surgery, and she
certainly does not show that her eyesight or endurance level
barred her "from working in all jobs within the [nursing] field"
or prevented her "from holding a large number of jobs in other
categories of employment." *Bryson,* 498 F.3d at 576.  "An
'impairment that only moderately or intermittently prevents an
individual from performing major life activities is not a
substantial limitation' under the ADA." *Id.* at 576 (quoting

*Mahon,* 295 F.3d at 590-91).[15]  And, where "jobs utilizing an individual's skills . . . are available, one is not precluded from a substantial class of jobs."  *Milholland,* 569 F.3d at 568 (internal quotations and citation omitted).  Accordingly, Plaintiff fails to present any evidence that creates a genuine issue that she was "disabled" within the meaning of the ADA or the KCRA.

   *(4) Plaintiff Fails To Show "Regarded As" Disability.*  For a "regarded as" disability claim, it is not sufficient for Plaintiff to show HealthSouth "regarded [her] as somehow disabled; rather, the plaintiff must show that the employer regarded the individual as disabled *within the meaning of the ADA.*'"  *Jones v. Nissan North America, Inc.,* No. 09-5786, 2011 WL 3701785, at *8 (6th Cir. Aug. 18, 2011) (emphasis added) (quoting *Ross,* 237 F.3d at 709).  Plaintiff would need to show that HealthSouth regarded her aneurysm effects as "substantially limiting" her from working in a "broad class of jobs," but here Plaintiff was neither substantially limited nor precluded from working.  Accordingly, summary judgment is also appropriate on the "regarded as" aspect of Plaintiff's ADA claim, even if she

---

[15] *See also, e.g., Whitson v. Union Boiler Co.,* 47 F. App'x 757, 762 (6th Cir. 2002) (person with vision of "20/300 in his left eye and 20/30 in his right eye" not substantially limited where there was "no evidence that his vision impairment prevents him from performing normal daily activities or work"); *Cunningtham v. Humana Ins. Co.,* 2011 WL 4054689 at *2 (W.D. Ky. 2011) (multiple sclerosis diagnosis alone insufficient absent showing by plaintiff of an inability to walk or concentrate).

had established that HealthSouth accommodated her relative lack of endurance by giving her a reduced schedule. *See, e.g., id.* at n.11; *Milholland,* 569 F.3d at 568-69; *see also Linser v. State of Ohio, Dept of Mental Health,* No. 99-3887, 2000 WL 1529809, at *4 (6th Cir. Oct. 6, 2000) ("The fact that Defendants previously granted Linser's request for accommodation does not by itself establish that Defendants regarded Linser as disabled. . . . Moreover, there is no evidence in the record which tends to show that Defendants perceived Linser as incapable of working a class of jobs or a broad range of jobs.").

Accordingly, Plaintiff fails to present any evidence that creates a genuine issue that she was "disabled" within the meaning of the ADA or the KCRA.

## C.  ERISA Claims (Count IV).

In Count IV, Plaintiff brings suit under section 510 of ERISA. *See* Complaint at 6.  Section 510 alternatively prohibits "discharge" or "discrimination" against a "participant or beneficiary" for:  (1) "exercising any right to which [s]he is entitled under the provisions of an employee benefit plan," or (2) "the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140.  The subtitle to Count IV in Plaintiff's complaint indicates that she is pursuing both "retaliation" and

"interference" theories of recovery under ERISA.  *See* Complaint at 6.

Plaintiff does not identify the precise "employee plan" at issue and, presumably, she means her health insurance coverage. Also, save for one requirement, "retaliation" and "interference" are two are independent theories with different elements, but the parties do not distinguish between the two.  Finally, Plaintiff does not even mention her retaliation claim in response and focuses exclusively on "interference."  *See* Response at 31-32.  In the interest of completeness, however, the Court will address both.

**(1) Elements Of Prima Facie Cases.**  The "interference" aspect of section 510 "was designed to prevent 'unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights,'" meaning "an employee's right to attain future entitlements to retirement benefits." *Majewski v. Automatic Data Processing, Inc.,* 274 F.3d 1106, 1113 (6th Cir. 2001) (quoting *West v. Butler,* 621 F.2d 240, 245 (6th Cir. 1980)).  To avoid the situation where "every employee discharged by a company with an ERISA plan would have a claim," binding precedent requires that, to establish "a prima facie case" of "interference," Plaintiff must demonstrate both that:  (1) she "lost the opportunity to accrue new benefits;" and (2) HealthSouth had "the specific intent of

avoiding ERISA liability" when it discharged her.  *Id.* (citing *Smith v. Ameritech,* 129 F.3d 857, 865 (6th Cir. 1997)).

When there is no "direct" evidence of "specific intent," a plaintiff can alternatively establish a prima facie case by showing:  (1) prohibited employer conduct; (2) taken for the purpose of interfering; (3) with the plaintiff's ability to attain any right to which the employee was entitled.  *See Lockett v. Marsh USA, Inc.,* 354 F. App'x 984, 991 (6th Cir. 2009) (citing *Schweitzer v. Teamster Local 100,* 413 F.3d 533, 537 (6th Cir. 2005)); *Welsch v. Empire Plastics, Inc.,* No. 99-3420, 2000 WL 687678, at *3 (6th Cir. May 19, 2000) (citing *Pennington v. Western Atlas,* 202 F.3d 902, 906 (6th Cir. 2000)).

A recent decision questions the propriety of the second prong in a circumstantial evidence case, similar to the Sixth Circuit's rejection of the *Mahon* test in the ADA context.  *See Crawford,* 560 F.3d at 613-14.  The earlier cases that announced this variant of the prima facie case and later cases seem to say that the second element is really one of causation:

> The Eighth Circuit has held that part of a plaintiff's prima facie burden under § 510 is to "demonstrate a causal connection between the likelihood of future benefits and an adverse employment action." *Kinkead v. Southwestern Bell Tel. Co.,* 49 F.3d 454, 457 (8th Cir. 1995).  Although we did not classify it as part of the plaintiff's prima facie case, we stated in *Humphreys* that a plaintiff must show "'a causal link between pension benefits and the adverse employment

> decision.   In order to survive defendants'
> motion for summary judgment, plaintiff must
> come forward with evidence from which a
> reasonable jury could find that the
> defendants' desire to avoid pension
> liability was a determining factor in
> plaintiff's discharge.'"   966 F.2d at 1044
> (quoting *Nixon v. Celotex Corp.,* 693 F.Supp.
> 547 (W.D. Mich. 1988)).   In *Mattei v.
> Mattei,* 126 F.3d 794 (6th Cir. 1997), we
> discussed the requirements for establishing
> a claim under § 510 and noted that in an
> interference claim, "the alleged illegal
> activity will have a causal connection to
> the plaintiff's ability to receive an
> identifiable benefit." *Id.* at 808.

*Smith,* 129 F.3d at 865.   Even cases that still maintain the

second prong invoke this language from *Smith.*   *See, e.g.,*

*Welsch,* 2000 WL 687678, at *3 (citation omitted).[16]

Perhaps all these decisions convey is that, even though

"causation" technically is not part of the alternative prima

facie case, in the end, if a plaintiff has no proof of

causation, then an ERISA "interference" claim will fail.[17]   That

---

[16] The Eighth Circuit, cited by *Smith,* defines the prima facie circumstantial case solely in terms of causation.  *See, e.g., Libel v. Adventure Lands of America, Inc.,* 482 F.3d 1028, 1034-35 & n. 7 (8th Cir. 2007) ("With respect to her claim of interference with prospective insurance benefits under § 510 of ERISA . . . Libel can establish a prima facie case if she demonstrates a causal connection between the likelihood of future benefits and an adverse employment action.") (citation omitted).

[17] *See e.g., Schweitzer,* 413 F.3d at 537-39 ("While we do not necessarily require a plaintiff to prove the 'causal link' between the defendant's alleged illegal activity and his ability to receive benefits at this stage, . . . we do require a plaintiff's prima facie case to demonstrate 'not only that [the plaintiff] has lost the opportunity to accrue new benefits, but also that [the defendant] had the specific intent of avoiding ERISA liability when it discharged him,' . . . .   To hold otherwise would allow 'every employee discharged by a company with an ERISA plan [to] have a claim under § 510.'").

is certainly the case with a "retaliation" claim.   "To establish a prima facie case of retaliation under § 510, an employee must show that (1) she was engaged in activity that ERISA protects; (2) she suffered an adverse employment action; and (3) a causal link exists between her protected activity and the employer's adverse action."  *Hamilton v. Starcom Mediavest Group, Inc.,* 522 F.3d 623, 628 (6th Cir. 2008).

*(2) "Interference" Claim Fails Independently.*  To "state a valid interference claim, the plaintiff's allegations should state, or at least support the inference, that the defendant possessed some control over either the benefit or its underlying funds."  *Mattei v. Mattei,* 126 F.3d 794, 808 (6th Cir. 1997); *see also id.* ("That may also suffice for a retaliation claims, but in [retaliation] cases such a showing of control is not mandatory.").

Plaintiff makes no assertion that HealthSouth had any control over the health care benefits her insurer paid.  In fact, HealthSouth asserts that the medical costs Plaintiff and her husband incurred had no impact on the hospital because it pays the same premium rate for every employee covered by the health insurance plan.  See *MSJ* at 21-22; *see also* Gosney Aff. ¶ 31 ("Ms. Laws' [health insurance] claims also did not affect the budget of [HealthSouth].  The hospital was charged the same

premium charge per month for Ms. Laws and her husband as it paid for all other employees that elected to be covered on the plan. The insurance plan charges a flat amount per insured employee each month.  [HealthSouth employees do] not have access to the details related to the actual costs of employees' claims.").  Plaintiff takes no issue with this factual assertion.  As such, she fails to establish what has been held in this circuit to be a mandatory prerequisite for her interference claim.

(3) "Retaliation" Claim Independently Fails.  A key element in a "retaliation" action is that after an employee engaged in "protected activity," the employer decided to deny the employee a "benefit."  See Mattei, 126 F.3d at 805-06.  Such activities include making a claim for benefits, filing lawsuits, acting as a whistleblower or complaining about the employer's violation of the law.  See, e.g., id. (and examples cited therein); DeFelice v. Heritage Animal Hosp., Inc., No. 08-14734, 2010 WL 3906147, at **2-4 (E.D. Mich., Sept. 29, 2010) (complaints of illegal activity); Evanoff v. Banner Mattress Col, Inc., No. 3:07CV1754, 2008 WL 4683300, at *9 (N.D. Oh. Oct. 21, 2008) (filing declaratory judgment action).

Plaintiff does not cite any decision that holds the use of sick leave and health insurance constitutes a "protected" activity for ERISA purposes.  A recent decision flatly holds that loss of future ERISA benefits is not cognizable.  Bailiff

*v. Adams County Conference Bd.,* 54 F. Supp. 2d 923, 928 (S.D. Iowa 1999) ("In the instant case, plaintiff has not alleged any causal connection between his loss of health insurance benefits and his termination.  In essence, his allegation under Count III is that as a consequence of losing his job, he was also no longer eligible to participate in the group health plan used for Adams County employees. Such a claim does not state a tort under federal law.").  And, an early Ninth Circuit case considered taking leave for major back surgery as "protected," but made it clear that the routine sick leave the employee took immediately before the discharge would not suffice:

> Kimbro's back surgery, which required the continuous use of sick leave days over a sustained period occurred five years before his discharge.  Moreover, his use of benefits immediately prior to his termination was not at a significantly greater rate than his use during previous periods in which he was suffering from migraines or having difficulty with his back.

*Kimbro v. Atlantic Richfield Co.,* 889 F.2d 869, 881 (9th Cir. 1989).

In the absence of any binding authority to the contrary, and since an FMLA cause of action covers the major surgery recognized as "protected" in *Kimbro,* this court declines to extend the definition of ERISA "protected activity" to the use of sick leave with resulting health insurance coverage for the

medical services sought during that leave.  Consequently, Plaintiff also fails to meet one of the elements of the prima facie case for a retaliation claim.

*(4) Both Theories Fail On "Causation" Prong.*  Plaintiff's retaliation and interference claims also fail for a lack of causation.  Plaintiff argues "temporal proximity" is "sufficient to establish a prima facie case," and that she was "terminated shortly after she and her husband incurred a series of extraordinarily high medical bills covered by . . . insurance through HealthSouth."  Response at 31 (citing *Pennington,* 202 F.3d at 908-09).  According to Plaintiff's affidavit, those bills include her surgeries in the Summer of 2005, her surgery in the Summer of 2006, her husband's radiation treatments for cancer in late 2005 and early 2006, and apparently ongoing shots.  *See* Laws Aff. ¶¶ 2-7, 13.

In the Sixth Circuit, temporal proximity alone is not legally sufficient to establish causation unless the termination follows almost immediately on the heels of the protected conduct.  The inquiry is based on all of the circumstances, and "the more time that elapses between the protected activity and the adverse employment action, the more the plaintiff must supplement his claim with 'other evidence of retaliatory conduct to establish causality.'"  *Vereecke v. Huron Valley Sch. Dist.,* 609 F.3d 392, 400 (6th Cir. 2010) (quoting *Mickey v. Zeidler*

-53-

*Tool & Die Company,* 516 F.3d 516, 524-25 (6th Cir. 2008)); *see also, e.g., Hamilton v. Starcom Mediavest Group, Inc.,* 522 F.3d 623, 629 (6th Cir. 2008).  Thus, while conduct occurring within a few days to three months can qualify as proximate, longer periods will not.[18]  In contrast, no decision cited by Plaintiff holds that events occurring years prior to termination are considered proximate enough to establish, without more, the causation prong of a prima facie case.[19]

Therefore, "in order to overcome" her lack of showing of temporal proximity, Plaintiff "must present sufficient evidence supporting the causal connection."  *Gibson v. Shelly Co.,* 314 F. App'x 760, 773 (6th Cir. 2008).  "[O]f course, an employee's

---

[18] *See, e.g., Lindsay v. Yates,* 578 F.3d 407, 419 (6th Cir. 2009) (citing cases ranging from same day to three months); *Hamilton v. General Elec. Co.,* 556 F.3d 428, 435-36 (6th Cir. 2009) (less than three months); *Clark,* 424 F. App'x at 473 (two months between returning from FMLA leave and termination, citing cases involving periods of thirteen and twenty-one days); *Evanoff v. Banner Mattress Co.,* Inc., No. 3:07CV1754, 2008 WL 4683300, at *9 (N.D. Ohio 2008) ("[T]he adverse employment actions occurred within one to three months of Evanoff's ERISA-protected activity. While this factor alone is not dispositive, the Sixth Circuit does consider the proximity of time in determining the existence of a causal link under ERISA.").

[19] *See Clark County School Dist. v. Breeden,* 532 U.S. 268, 273-74 (2001) ("The cases that accept mere temporal proximity . . . as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close' [citing cases that require less than four months].  Action taken (as here) 20 months later suggests, by itself, no causality at all."); *Alexander v. Ohio State Univ. College of Social Work,* 2011 WL 2535277 at *7 (6th Cir. 2011) ("This court has held that an inference of retaliation may be established based on temporal proximity of two or three months. . . .  The nine-month gap here is too long to permit the inference, absent some other evidence."); *Hamilton,* 522 F.3d at 629-30 ("Considering the nine-month period at issue here, Hamilton would have to provide additional evidence of causation to withstand summary judgment for failing to establish even a prima facie case.").

protected activities will be the cause of an employer's retaliatory conduct *only where* the employer knew of those protected activities." *Hamilton,* 522 F.3d at 628 (citing *Thaddeus-X v. Blatter,* 175 F.3d 378, 387 n. 3 (6th Cir. 1999)) (emphasis added).

HealthSouth asserts that employees at the "local hospitals" have no access to the actual costs of health insurance claims filed by employees. *See MSJ* at 21-22. The affidavits of CEO Gosney, CNO Fey, HRD Goldschmidt, and Regional Director Koehler state that they did not know Plaintiff's insured status, had no access to that information, had no actual knowledge of the details of the health insurance benefits paid to cover the bills of Plaintiff or her husband and/or, as discussed earlier, that any such payments do not effect the budget because the hospital pays the a flat premium per employee per month. *See, e.g.,* Gosney Aff. ¶¶ 30-31; Fey Aff. ¶¶ 22, 24; Goldschmidt Aff. ¶¶ 9-10; Koehler Aff. ¶¶ 7-8. In connection with her ERISA claim, the only other evidence Plaintiff relies upon is what the decision makers could have "surmised" about her healthcare costs. That is, a "jury could determine that, as at least two of those who were involved in the termination decision had extensive medical training, they would be able to surmise the extraordinary nature of the Laws' medical costs." Response at 31.

Conjecture about what decision makers could have guessed is utterly insufficient to sustain Plaintiff's burden.  "It is well settled that mere . . . conjecture and speculation are insufficient to support an inference of discrimination." *Grizzell v. City of Columbus Div. of Police,* 461 F.3d 711, 724 (6th Cir. 2006) (internal quotations and citations omitted). Nor is such evidence sufficient generally to defeat summary judgment.  *See Shafer Redi-Mix, Inc. v. Chauffeurs, Teamsters & Helpers Local Union #7,* 643 F.3d 473, 477 (6th Cir. 2011); *Kelly v. Warren County Bd.,* 396 F. App'x 246, 250 (6th Cir. 2010).  In any event, "the mere fact that an employee's termination would save the employer money in [benefit] costs . . . is not sufficient to prove the requisite intent in making a prima facie case under § 510."  *Schweitzer,* 413 F.3d at 539 (internal quotations and citations omitted).

**D.    FMLA Claims (Count III).**

Section 105 of the FMLA makes it unlawful for an employer to: (1) "interfere with, restrain, or deny the exercise of or the attempt to exercise" FMLA rights; or (2) "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA. 29 U.S.C. §§ 2615(a)(1)-(2).

Plaintiff's FMLA claim raises both "retaliation" and "interference" as the basis for recovery.  In the absence of

direct evidence, the *McDonnell Douglas* burden-shifting framework applies. *See, e.g., Clark v. Walgreen Co.,* 424 F. App'x 467, 473 (6th Cir. 2011); *Cutcher v. Kmart Corp.,* 364 F. App'x 183, 190 (6th Cir. 2010); *Bryson v. Regis Corp.,* 498 F.3d 561, 570 (6th Cir. 2007).  In general, the "interference" and "retaliation" theories are distinct, and blurring them is erroneous, though they do share a common element when the prima facie retaliation theory is at issue.  *See, e.g., Weimer v. Honda of America Mfg., Inc.,* 356 F. App'x 812, 816-17 (6th Cir. 2009) (district court's instructions blending the two theories was erroneous but harmless).

Plaintiff relies on HRD Goldschmidt's memorandum to Regional Director Koehler as direct evidence of retaliation. She considers it direct evidence because (1) the memorandum refers to "attendance" and included the 2007 discipline issued when Plaintiff was on FMLA leave that should have been purged from the file, and (2) the jury need not believe Regional Director Koehler's protestations that he did not consider Plaintiff's attendance in authorizing her termination.  *See* Response at 12.

**(1) Goldschmidt's Memorandum Does Not Constitute Direct Evidence.**  Both parties agree that the "direct evidence" must show "'that unlawful discrimination was at least a motivating factor in the employer's decision.'"  *Id.* (quoting *Weigel v.*

*Baptist Hosp.,* 302 F.3d 367, 386 (6th Cir. 2002)).[20]  HealthSouth correctly notes, however, that more than an inference of an unlawful motivating factor is required to constitute direct evidence.  *See Amini v. Oberlin College,* 440 F.3d 350, 359 (6th Cir. 2006).  In the FMLA context, "[d]irect evidence 'must establish not only that the plaintiff's employer was *predisposed* to discriminate on the basis of [the FMLA], but also that the employer *acted* on that predisposition.'"  *Clark,* 424 F. App'x at 472 (emphasis added) (quoting *Daugherty v. Sajar Plastics, Inc.,* 544 F.3d 696, 706 (6th Cir. 2008).  Evidence "is not considered direct evidence unless a[n improper] motivation is explicitly expressed."  *Grubb v. YSK Corp.,* 401 F. App'x 104, 109 (6th Cir. 2010) (internal quotations and citations omitted) (citing *DiCarlo v. Potter,* 358 F.3d 408, 415 (6th Cir.2004), *Hein v. All America Plywood Co.,* 232 F.3d 482, 488 (6th Cir.2000), and *Amini,* 440 F.3d at 359).

Thus, for example, the Sixth Circuit's *Clark* decision contrasted *Daugherty* where the supervisor stated that, if the employee took FMLA leave, then the employee would not be reinstated.  *Clark* characterized the *Daugherty* statement as direct evidence. 424 F. App'x at 472; *see also Hunter v. Valley*

---

[20] The Sixth Circuit has not addressed whether the modified summary judgment standard it applies in Title VII mixed-motive cases also applies "to an FMLA retaliation case."  *Hunter v. Valley View Local Schs.,* 59 F.3d 588, 692 & n.2 (6th Cir. 2009).

*View Local Schs.,* 59 F.3d 588, 692-93 & n.3 (6th Cir. 2009) (characterized as direct evidence:  supervisor affirmatively testified employee was placed on leave because of permanent medical restrictions and excessive absenteeism, most of which was due to FMLA leave).

In *Clark,* Walgreen fired an employee after he returned from FMLA leave for a heart condition for falsifying training records and directing others to complete tasks off the clock.  After corporate advised the supervisor to give the plaintiff the option to resign or be terminated, the supervisor told the plaintiff that he "should resign due to his health" and "'because of your health, we're just going to go ahead and terminate you.'"  *Clark,* 424 F. App'x at 471, 472.

These direct expressions about the employee's health were not considered "direct evidence" of an improper motive based on the FMLA, however, and summary judgment in favor of the employer was upheld.  The "allegedly offending statements, even if viewed in the light most favorable to [the plaintiff], do not compel the conclusion that [he] was fired in connection with his leave." *Id.* at 472.  Instead, they addressed the employee's "*post*-leave job performance as a function of his health." *Id.* Furthermore, the suggestion that the statements implied Walgreen considered Clark's potential use of future FMLA leave and health benefit funds "reach[ed] too far" since the facts showed that

"immediately" after the FMLA leave, Walgreen kept Clark in "the same position with the same schedule and benefits." *Id.*

As in *Clark,* nothing in the Goldschmidt memorandum qualifies as an explicit expression of intent to discharge Plaintiff because she used FMLA leave.  Even less compelling than as in *Clark,* nothing in Goldschmidt's memorandum or the attached documentation refers to Plaintiff's health, and certainly not her aneurysm or FMLA leave.  While it is true that the face of the 2006 discipline included Plaintiff's protestations that some of the leave was covered by doctors' excuses, there is nothing that suggests the doctor excuses were for the aneurysm or FMLA leave.  The same is true even more so for the 2007 attendance discipline that was to have been purged, which mentions noting about health or FMLA.  And, even more telling than in *Clark,* here, the accompanying documentation encompassed Plaintiff's chronic and longstanding attendance problems that both *pre*-dated and *post*-dated her FMLA leave periods in 2005, 2006, and 2007.  Consequently, the Goldschmidt materials are not direct evidence because they do not "require the conclusion that [Plaintiff's FMLA] leave prompted the firing." *Id.*  The lack of direct evidence on these facts applies equally to Plaintiff's retaliation and interference claims.  *See id.* at 474 (noting interference claim similarly failed for lack of direct evidence).

**(2) Interference Claim Fails For Lack Of Showing Of
"Entitlement" To, And Denial Of, FMLA Leave.** Plaintiff asserts
that because she took "repeated FMLA leave" in the years prior
to her termination, with "some of it just weeks before her
termination," jurors "would find" that HealthSouth "anticipated"
Plaintiff would take more leave in the future and terminated her
"to prevent her from taking any more FMLA leave."  Response at
18.  She argues that because the prohibited "interference"
involves "the right to [FMLA] entitlement," employer intent is
immaterial.  *Id.* at 17.  That may be so,[21] but Plaintiff's
allegations nonetheless fail to establish the critical elements
of an interference claim.  Among other things, to state and
prevail on a claim for FMLA "interference," the employee must
have been entitled to leave, notified the employer of his or her
intention to use the FMLA leave, and be denied the leave.  *E.g.,
Clark,* 424 F. App'x at 474 (citing *Wysong v. Dow Chem. Co.,* 503
F.3d 441, 447 (6th  Cir. 2007));*Verkade v. United States Postal
Serv.,* 378 F. App'x 567, 573 (6th Cir. 2010) (citing *Edgar v.
JAC Prods., Inc.,* 443 F.3d 501, 507 (6th Cir. 2006)); *Cutcher,*
364 F. App'x at 188-89 (citing *Grace v. USCAR,* 521 F.3d 655, 669

---

[21] "The significant difference between an interference and a retaliation
claim is the causal connection element, which encompasses an employer's
intent; in contrast to the interference theory, under the retaliation
theory, 'the employer's motive *is* an integral part of the analysis.'"
*Morris v. Family Dollar Stores of Ohio, Inc.,* 320 F. App'x 330, 338 (6th
Cir. 2009) (quoting *Edgar v. JAC Prods.* 443 F.3d 501, 508 (6th Cir.
2006)).

(6th Cir. 2008)); *Morris v. Family Dollar Stores of Ohio, Inc.,*
320 F. App'x 330, 336 (6th Cir. 2009) (citing *Cavin v. Honda of
Am. Mfg., Inc.,* 346 F.3d 713, 719 (6th Cir. 2003)).

Plaintiff makes no allegation that she was entitled to FMLA
leave, notified HealthSouth of the same, and denied leave. *See
Anderson v. Avon Prods., Inc.,* 340 F. App'x 284 (6th Cir. 2009)
(The problem with Anderson's claim is that Avon *did not deny his
request for FMLA leave.* . . . Anderson had not submitted any
FMLA paperwork . . . so [the supervisor] was left to guess
whether Anderson's request was due to a 'serious health
condition' under the FMLA, or simply a request for a sick day
that Anderson did not have."); *Cavin v. Honda of Am. Mfg., Inc.,*
346 F.3d 713, 723 (6th Cir. 2003) ("To invoke the protection of
the FMLA, an employee must provide notice and a qualifying
reason for requesting the leave."). In short, she does not
provide evidentiary support for these necessary elements.

In addition, Plaintiff's "termination-as-preemption"
against future use of FMLA leave not only merges her retaliation
arguments with her "interference" theory, which itself is
problematic, *see Weimer,* 356 F. App'x at 817, the *Clark* decision
rejected the "termination-as-preemption" argument in both the
retaliation and interference contexts where the employee in fact
returned to work after taking the FMLA leave without
restrictions from the doctor. *See Clark,* 424 F. App'x at 427,

474. For these reasons alone, Plaintiff fails to establish a claim for FMLA "interference."

    *(3) Retaliation "Replacement" Prima Facie Alternative Not Asserted.* The *Clark* decision identifies two alternative means of establishing a prima facie FMLA retaliation claim, the second of which is that Plaintiff: "'is a member of a protected class; . . . was qualified for the job; . . . suffered an adverse employment decision; and . . . was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees.'" *Clark,* 424 F. App'x at 473 (quoting *Newman v. Fed. Express Corp.,* 266 F.3d 401, 406 (6th Cir. 2001)). Plaintiff does not invoke this alternative, *see* Response at 13, and it would fail in any event for the same reasons her ADEA claim fails.

    *(4) Alternative Retaliation Prima Facie Case.* The other alternative for establishing a prima facie case of FMLA retaliation is for Plaintiff to establish that she: (1) was engaged in protected FMLA activity; (2) suffered an adverse employment action; and (3) a causal connection between the two. *E.g., Clark,* 424 F. App'x at 473; *Cutcher,* 364 F. App'x at 190; *Morris,* 320 F. App'x at 338. Plaintiff approaches this from two different perspectives.

    Plaintiff first focuses on the leave she took for the cerebral angiogram in early September 2008 as the "protected

activity" that is "temporally proximate" to her termination.
*See* Response at 14, 16.  Second, Plaintiff invokes selected
events that occurred between her 2005 surgery and termination
and argues they constitute circumstantial evidence that, after
she took FMLA leave in 2005, 2006, and 2007, HealthSouth engaged
in "unwarranted" discipline over attendance, over the chairs,
the fearless leader comment, and even over her note to
discontinue the Vicodin since CNO Fey did not direct Supervisor
Edmondson to discipline Plaintiff for the conduct.  *See* Response
at 15.  She also urges the court to consider the "evidence . .
presented [on] pretext" as a basis for the "jury to find a
question of causal connection" on her FMLA claim.  Response at
16-17.

The Sixth Circuit decisions are not in accord regarding
whether it is appropriate to consider evidence of pretext at the
prima facie stage of an FMLA case.[22]  Nevertheless, given that

---

[22] *Compare Grubb,* 401 F. App'x at 112 ("just as it would be inappropriate
for a court to consider an employer's proffered nondiscriminatory reason
for taking an adverse employment action when analyzing a plaintiff's prima
facie case, it is improper for Grubb to attempt to prove that YSK's
actions were pretextual prior to establishing a causal connection between
his use of FMLA leave and his termination.") (citing *Wexler,* 317 F.3d at
574), *with Pettit v. Steppingstone, Center for the Potentially Gifted,* 429
F. App'x 524, 535 (6th Cir. 2011) ("This Court recognizes the
appropriateness of plaintiff's presentation of overlapping evidence in
support of both the causal connection element of the prima facie case and
the pretext stage of inquiry.  While evidence of causal connection at the
prima facie stage is often probative of pretext also, the plaintiff's
burden at the prima facie stage is easily met.  However, that evidence may
be insufficient, standing alone, to raise a genuine issue as to
pretext.").

the burden at the prima facie stage generally is not onerous,
the Court will assume that Plaintiff establishes a prima facie
of FMLA retaliation, and move on to the pretext issue.

### *Analysis Of Pretext*

HealthSouth indisputably met its burden of articulating
legitimate and nondiscriminatory reasons for firing Plaintiff.
Not only did she violate nursing regulations by engaging in
unilateral conduct that resulted in a patient suffering pain,
she was repeatedly and publicly insubordinate to the CEO.  *See,
e.g., Arnold v. Marous Bros. Const., Inc.,* 211 F. App'x 377, 381
(6th Cir. 2006) ("This court has confirmed that insubordination
can constitute legitimate reasons for termination.") (citing
*Cooley v. Carmike Cinemas, Inc.,* 25 F.3d 1325, 1330 (6th Cir.
1994)).  Plaintiff must, therefore, prove by a preponderance of
the evidence that the articulated reason was a "pretext" for
discrimination.  *E.g.,McDonnell Douglas Corp. v. Green,* 411 U.S.
792, 802-05 (1973); *Henry*, 2011 WL 3444089, at **7, 9.

Plaintiff has three options for showing pretext.  She can
show: "(1) that the proffered reasons had no basis *in fact,* (2)
that the proffered reasons did not *actually* motivate [her]
discharge, or (3) that they were insufficient to motivate
discharge."  *Henry,* 2011 WL 3444089, at *10 (internal quotations
and citations omitted); *see also* Response at 18.  Regardless of
the option chosen, to carry her burden on summary judgment

-65-

Plaintiff "must produce sufficient evidence from which a jury could *reasonably* doubt the employer's explanation." *Henry,* 2011 WL 3444089, at *10 (internal quotations and citations omitted) (emphasis added).

Plaintiff does not contend that the reasons had no basis in fact, or that the reasons were insufficient.[23]  Instead, she focuses exclusively on the second option.  In general, she argues a jury could reject the articulated reasons, *see* Response at 19-25, and conclude her age, disability, family's medical bills, and/or leave requirements were the "true motivation," *id.* at 31.  With electing to show pretext under the "actual motivation" option, Plaintiff is arguing that "the sheer weight of the circumstantial evidence of discrimination make it more likely that not that the employer's explanation is a pretext, coverup." *Henry,* 2011 WL 3444089, at *10.  She has not made a genuine showing in this regard.

Certain showings will not suffice.  For example, "[t]emporal proximity is insufficient to carry this burden." *Pettit,* 429 F. App'x at 536.  Neither will relying solely on

---

[23] Nor can she establish either situation.  Here there is no dispute that HealthSouth "made a reasonably informed and considered decision before" firing Plaintiff.  *Henry,* 2011 WL 3444089, at *10 (internal quotations and citation omitted).  For the reasons discussed previously, Plaintiff has not demonstrated that "non-protected employees were not terminated even though they engaged in substantially similar conduct."  *Id.* at *12.  Essentially the same analysis for a "comparable discipline" argument applies at both the prima facie case and pretext stages.  *Cf. Smith v. Leggett Wire Co.,* 220 F.3d 752, 762 (6th Cir. 2000).

"'credibility considerations or subjective evidence.'"  *Lyons v. Metropolitan Government of Nashville and Davidson County,* 416 F. App'x 483, 490 (6th Cir. 2011) (quoting *Cox v. Kentucky DOT,* 53 F.3d 146, 150 (6th Cir. 1995)).  Simply arguing that the jury can "refuse to believe the employer's explanation" does not satisfy Plaintiff's burden.  *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1083 (6th Cir. 1994) ("The jury may not reject an employer's explanation, however, unless there is a sufficient basis *in the evidence* for doing so.  To allow the jury simply to refuse to believe the employer's explanation would subtly, but inarguably, shift the burden of persuasion from the plaintiff to the defendant, which we must not permit."), *abrogation on other grounds by Gross v. FBL Fin. Serv., Inc.*, 129 S. Ct. 2343 (2009).

Here, Plaintiff relies on the sequence of events and instances where "HealthSouth's witnesses offer multiple, conflicting versions regarding who make the termination decision and for what reasons" as the basis for a jury to disregard the proffered legitimate reasons for Plaintiff's discharge.  *See* Response at 18-25.  These include various alleged discrepancies in testimony and affidavits concerning: whether CEO Gosney knew of the Vicodin incident prior to October 1, 2008; whether CNO Fey began an immediate investigation or "delayed;" whether CNO Fey, CEO Gosney, and HRD Goldschmidt elected to recommend

termination based on the "fearless leader" incident, the Vicodin incident, the chair incident, attendance issues, or a combination of the same; whether CNO Fey, CEO Gosney, and/or HRD Goldschmidt individually or in combination were responsible for making he recommendation to Regional Director Koehler; *see id.* at 19-25; and, whether Koehler considered all of the reasons but rejected attendance issues to "cover up the evidence that [Plaintiff's] FMLA leave was initially proffered to justify the termination decision," *id.* at 21.

However, as in *Henry,* "[w]hen multiple individuals are involved in a termination decision, it is immaterial that they describe the situation differently as long as they all are referring to the same basic conduct." *Henry,* 2011 WL 3444089, at *12.  The significant facts giving rise to the decision to recommend Plaintiff's termination are not in dispute – the confluence of Plaintiff acting outside the scope of her duties and causing a patient pain, accompanied by yet another instance of public insubordination within less than a year.  See *id.*  On that all witnesses are in accord.  Thus, this is not a situation where the justification for firing Plaintiff has shifted over the course of litigation.  Moreover, there is no dispute that Regional Director Koehler was the ultimate decisionmaker and he never waivered from his position that the sole basis for his decision was the Vicodin incident.  *See id.* (and cases cited

therein); *see also Schoonmaker,* 595 F.3d at 269; *Alexander v. Ohio State Univ. College of Social Work,* 429 F. App'x 481, 489 (6th Cir. 2011), *petition for cert. filed 8/24/11* (U.S. Aug. 24, 2011) (No. 11-361).  Therefore, Plaintiff fails to establish pretext, an independent basis upon which to dismiss all of her claims.

By discontinuing a patient's medication without physician authorization, Plaintiff "'gave the company ample reason" to discharge [her]'" and that reason "sufficed to motivate its decision." *Breen v. Infiltrator Systems,* 417 F. App'x  483, 487 (6th Cir. 2011) (quoting *Sherrills v. Beison,* 242 F. App'x 332, 337 (6th Cir. 2007) (employee failed to follow company policy, was insubordinate in front of client and had hostile relationship with the customer service department); *see also Russell v. Univ. of Toledo,* 537 F.3d 596, 604-05 (6th Cir. 2008) (nurse discharged for failing to carry out physician's order and insubordination).

Plaintiff's "gut feelings" that discipline she encountered in 2008 was simply a ruse to mask that HealthSouth was targeting her for termination based on the combination of her age and aneurysm is simply speculation.  *See Hall v. OhioHealth Corp. Doctor's Hosp.,* ____ F. App'x ____, No. 10-3327, 2011 WL 3156304, at *3 (6th Cir. Jul. 27, 2011) ("Hall pulls three facts from the record in his effort to undermine OhioHealth's proffered reasons

and establish a genuine issue of material fact regarding pretext.  We address each in turn and conclude that his evidence amounts to nothing more than speculation."); *Carson v. Patterson Companies, Inc.,* 423 F. App'x 510, 514 (6th Cir. 2011) ("gut feeling" alone will not suffice to "go to the jury" on pretext).

Therefore, having reviewed this matter, and the court being otherwise sufficiently advised,

**IT IS ORDERED** as follows:

1.   Defendant's motion for summary judgment (Doc. #22) be, and it is, hereby granted;

2.   This action is dismissed in its entirety; and

3.   A separate judgment shall enter concurrently herewith.

This 1st day of November, 2011.



**Signed By:**

*William O. Bertelsman* WOB

**United States District Judge**